UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X

DENISE WOODS,                          :

                    Plaintiff,         :

        - against -                    :

ENLARGED CITY SCHOOL DISTRICT OF       :
NEWBURGH and DR. RICHARD NICHOLAS JOHNS,
sued in his individual capacity        :

                    Defendants.        :

- - - - - - - - - - - - - - - - - - - X

**ECF CASE**

04 Civ. 9106 (WCC)

**OPINION
AND ORDER**

**A P P E A R A N C E S :**

LAW OFFICES OF MICHAEL H. SUSSMAN
**Attorneys for Plaintiff**
40 Park Place, 2nd Floor
P.O. Box 1005
Goshen, New York  10924

MICHAEL H. SUSSMAN, ESQ.

        Of Counsel

RUTHERFORD & CHRISTIE, LLP
**Attorneys for Defendants**
300 East 42nd Street, 18th Fl.
New York, New York 10017-5947

JOHN S. DIACONIS, ESQ.
LEWIS R. SILVERMAN, ESQ.

        Of Counsel

**Copies E-Mailed to Counsel of Record**

**Conner, Sr. D.J.:**

Plaintiff Denise Woods, an African American woman, brings this action, pursuant to 42 U.S.C. § 1981a, 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 as amended by 42 U.S.C. § 2000e, *et. seq.* ("Title VII") and Article 15 of the New York Human Rights Law § 296 (the "New York Human Rights Law"), against defendants Enlarged City School District of Newburgh (the "District") and the District's Superintendent Dr. Richard Nicholas Johns ("Johns") (collectively, "defendants").[1] Plaintiff alleges that defendants: (1) subjected her to a racially hostile working environment in violation of Title VII; (2) terminated her employment on the basis of her race in violation of Title VII; and (3) retaliated against her, in violation of Title VII and the First Amendment to the United States Constitution, for plaintiff's and her husband's statements to Johns that District personnel were racially discriminating against her.  Defendants move for summary judgment on all counts.  For the reasons that follow, defendants' motion is granted.

---

[1] Plaintiff's non-Title VII claims for racial discrimination and hostile working environment, namely those pursuant to (1) 42 U.S.C. § 1981a, (2) the Equal Protection Clause of the United States Constitution made actionable against defendants by 42 U.S.C. § 1983 and (3) the N.Y. Human Rights Law, are all governed by the substantive standards that apply to plaintiff's claims under Title VII.  *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core susbtantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause."); *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) ("[Plaintiff's] equal protection claim parallels his Title VII claim.  The elements of one are generally the same as the elements of the other and the two must stand or fall together."); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000) (stating that state discrimination claims are subject to the same Title VII analysis); *Reed v. A.W. Lawrence & Co., Inc.*. 95 F.3d 1170, 1177 (2d Cir. 1996) (same).  Accordingly, we will address them in tandem with plaintiff's Title VII claims.

## BACKGROUND

Viewed in the light most favorable to plaintiff,[2] the record reveals the following relevant facts.[3]  On August 30, 2000, the District hired plaintiff as a Program Specialist at Gardnertown Fundamental Magnet School ("Gardnertown"), an elementary school consisting of kindergarten through sixth grade.  (*See* Defs. Rule 56.1 Stmt. ¶ 2; Pl. Rule 56.1 Stmt. ¶ 2.)  The Principal of

---

[2] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, No. 04-6282-CV, 2007 WL 29977, at *5 (2d Cir. Jan. 5, 2007) ("'In assessing the record to determine whether there is [a genuine issue of material fact], the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'") (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir.1997)); *Tocker v. Philip Morris Co., Inc.*, 470 F.3d 481, 486 (2d Cir. 2006) ("We [must] . . . constru[e] the facts in the light most favorable to the non-moving party . . . ."); *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03 Civ. 1895, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) ("In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party.").

[3] Plaintiff's Verified Complaint and Amended Complaint contain 213 paragraphs alleging a litany of incidents that plaintiff claims, taken together, constitute evidence of a racially hostile working environment, racial discrimination and retaliatory discharge.  In plaintiff's affidavit, she declares those same allegations to be true and accurate and requests that they be incorporated therein. (*See* Pl. Affm. ¶ 5; Pl. Mem. Opp. Summ. J. at 2.)  This has complicated the Court's task in considering plaintiff's opposition, particularly because plaintiff's Verified Complaint, which was not drafted by present counsel, is not a model of clarity and is filled with oft-repeated conclusory statements couched in legal terms.  Moreover, plaintiff's counsel has failed to cite the record where appropriate in his Memorandum of Law.  While he occasionally cites the record in his Rule 56.1 Statement, several material allegations in the Memorandum of Law are not found in his Rule 56.1 Statement and counsel does not provide supporting authority therefor.  In addition, although plaintiff's position is that all of the alleged incidents of harassment taken together provide the factual basis for plaintiff's hostile working environment claim, plaintiff's counsel fails to submit a sufficiently detailed statement of facts and merely relies on general incorporation clauses that would require the Court to search the record for all material facts, even if not averred in plaintiff's Rule 56.1 Statement or Memorandum of Law.  *But see Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 132 (2d Cir. 2004); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001); *Healthfirst, Inc. v. Medco Health Solutions, Inc.*, No. 03 CV 5164, 2006 WL 3711567, at *5 (S.D.N.Y. Dec. 15, 2006) ("The court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention.") (internal quotation marks and footnote omitted).  Nevertheless, we have conducted a thorough review of the record, construing it in the light most favorable to plaintiff, to determine whether summary judgment is appropriate. *See Healthfirst*, 2006 WL 3711567, at *5.

Gardnertown, Steven Runberg, a Caucasian male, recommended plaintiff for the position, which was a probationary appointment for two years.  (*See id.*)  The position of Program Specialist was categorized as a teacher's position and not at the administrative level.  (*See* Diaconis Decl., Ex. T (Pl. Dep. at 24-25); Diaconis Decl., Ex. F. (Henderson Dep. at 90).)

Plaintiff alleges that, at the onset of her employment, several District employees immediately made her feel uncomfortable and unwelcomed.  (*See* Pl. Rule 56.1 Stmt. ¶ 4; Complt. ¶¶ 8-9, 13.)  For example, after she accepted the position of Program Specialist, Runberg introduced plaintiff and her family to his secretary, Pat Crosetta ("Crosetta"), who, according to plaintiff, did not acknowledge their presence.  (*See* Complt. ¶ 8.)  Similarly, plaintiff asserts that when Runberg introduced plaintiff and her family to two teachers, "[b]oth of the teachers acted as if [she] and her family were invisible . . . ."  (*See id.* ¶ 9.)  Although plaintiff claims that Runberg failed to take corrective action with respect to either incident, plaintiff at that time did not inform Runberg of the hostility that she perceived during these introductions.  (*See id.* ¶ 10.)

The remainder of plaintiff's allegations almost exclusively involve three Caucasian teachers, Linda Apuzzo ("Apuzzo"), Eve Gordon ("Gordon") and Robin Phillips ("Phillips"),[4] whom plaintiff and her counsel refer to as the "clique" throughout plaintiff's submissions to the Court.   Plaintiff claims that these women persistently harassed her or acted disrespectful towards her.  (*See generally* Complt; Pl. Affm. ¶ 3.)  For example, plaintiff alleges that, in September 2000, when Runberg first introduced her to the entire staff as the new Program Specialist, they did not clap along with the remainder of the staff in attendance.  (*See id.* ¶ 14.)  Plaintiff asserts that they stared at her "with

---

[4] Apuzzo teaches sixth grade, Gordon teaches second grade and serves as the National Teacher's Association ("NTA") union delegate and Phillips teaches third grade.  (*See* Defs. Rule 56.1 Stmt. ¶¶ 4-5; Complt. ¶ 41; Diaconis Decl., Ex. E.)

looks of disgust on their faces." (*See id.*)  Shortly thereafter, Apuzzo, Gordon and Phillips went to plaintiff's office and one of them indicated that plaintiff "didn't know what she was in for, for taking the job." (*See id.* ¶ 15.)  Gordon also stated that "I'm telling you that you better be prepared.  I hope that you're well organized." (*See id.* ¶ 16.)  On other occasions, according to plaintiff, "[t]hey would come to [her] office or confront her in the hallway and ask her a question[, and w]hile [she was] in the middle of responding to their inquiry[,] they would say forget it or you probably don't know anyway, I'll just go ask Principal Runberg[.]" (*See id.* ¶ 18.)

On July 25, 2001, on Runberg's recommendation, the District appointed plaintiff as Assistant Principal of Gardnertown, an administrative position, for a three-year probationary period ending on August 15, 2004.  (*See* Defs. Rule 56.1 Stmt. ¶ 3; Pl. Rule 56.1 Stmt. ¶ 3; Diaconis Decl., Ex. B; Diaconis Decl., Ex. T (Pl. Dep. at 227).)  Plaintiff was promoted in accordance with a District directive mandating that all Program Specialists be reclassified as Assistant Principals.  (*See* Pl. Rule 56.1 Stmt. ¶ 3; Pl. Affm. ¶ 2.)  As Assistant Principal, plaintiff reported directly to Runberg who in turn reported to the District's administrators, including Assistant Superintendents Olivia Henderson ("Henderson") and Dr. James Dupree ("Dupree"), both of whom are African American.  (*See* Diaconis Reply Decl., Ex. A (Johns Dep. at 36); Pl. Affm. ¶ 3; Defs. Reply Mem. Supp. Summ. J. at 2.)

Plaintiff alleges that upon her promotion to Assistant Principal, Apuzzo, Gordon and Phillips continued to treat her with disrespect.  (*See generally* Complt. ¶¶ 24-180; *see also* Diaconis Decl., Ex. D (Runberg Dep. at 102); Sussman Affm., Ex. 11 (L. Woods Dep. at 62).)  For example, in October 2001, according to plaintiff, Phillips accused plaintiff of poor judgment in the presence of a parent.  (*See* Complt. ¶ 31.)  Plaintiff reported this to Runberg, but he failed to take any disciplinary

4

action against Phillips and instead "interrogated [plaintiff] as if she was the problem." (*See id.* ¶ 32.)
A month later, while at a staff meeting, Phillips openly criticized a joint decision made by plaintiff
and Runberg by shouting, "I don't believe this." (*See id.* ¶ 35.)  According to plaintiff, Runberg
again failed to reprimand Phillips or otherwise indicate that her behavior was unprofessional.  (*See
id.*)

Plaintiff also alleges that, in December 2001, she entered Gordon's classroom to conduct a
teacher observation, and Gordon informed her in a nasty manner, "You're not observing me[,] Mr.
Runberg is!" (*See id.*)  Plaintiff alleges that when she approached Runberg regarding this incident,
he responded, "You don't want to mess with the union, I'm doing this for your own good!" (*See id.*
¶ 45.)   According to plaintiff, this demonstrated Runberg's lack of respect for plaintiff and his
proclivity to support the teachers rather than her.  (*See id.* ¶ 46.)

Indeed, plaintiff alleges that Runberg repeatedly sided with the teachers and failed to support
her. (*See generally* Complt.; *see* Pl. Affm. ¶ 3; Pl. Mem. Opp. Summ. J. at 2.)  For example, plaintiff
asserts that, at a meeting in August 2001, Phillips expressed strong opposition to the District's
directive to reclassify Program Specialists as Assistant Principals which caused plaintiff to feel
"personally and professionally attacked." (*See* Complt. ¶¶ 26-27.)  Plaintiff alleges that Runberg did
not defend the District's position, thereby condoning Phillips's "disrespectful" behavior towards
plaintiff.[5]  (*See id.* ¶ 26.)  In addition, upon her promotion to Assistant Principal, plaintiff sent

_____

[5] Plaintiff posits that Phillips's opposition to the District's reclassification of Program
Specialists as Assistant Principals was designed to undercut plaintiff and was racially motivated.
(*See* Complt. ¶ 27.)   Specifically, plaintiff claims that Apuzzo, Gordon and Phillips were
simultaneously advocating for the promotion of a Caucasian male who was the only Program
Specialist in the District not promoted to Assistant Principal. (*See id.*)  Plaintiff, however, provides
no evidence to support this assertion, nor any indication that she communicated this suspicion to
Runberg.

Runberg a memorandum regarding the reassignment of her duties, but, according to plaintiff, he never considered it and "made the teachers aware of that." (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 65); Complt. ¶ 24.)  Plaintiff asserts that Runberg thereby failed to "affirm her as a part of his team working toward the good of the school and the students." (*See* Complt.¶ 24.)

In November 2001, plaintiff had a dispute with Phillips that ultimately led Runberg to convene a meeting between the two in an effort to improve their working relationship. (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 48).)  While the events leading up to the meeting are a bit unclear as a result of the inadequacies of the parties' submissions and the witnesses' lack of recollection of the incident, plaintiff submits that Phillips openly criticized plaintiff's handling of an incident on a school bus and threatened to notify the NTA of the situation. (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 49); Complt. ¶ 28.)  Plaintiff alleges that Runberg was present when this occurred but failed to offer her any support. (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 49); Complt. ¶ 30.)

Subsequently, plaintiff went to Phillips's classroom and confronted her, stating, "You know Mrs. Phillips, I give respect and I demand it.  I don't appreciate how you talked to me in that tone about a bus referral that is an administrative issue." (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 50-51).)  Phillips thereafter requested a meeting with Runberg regarding the manner in which plaintiff confronted her.[6] (*See id.* (Pl. Dep. at 51).)  After Runberg informed plaintiff of Phillips's request for a meeting, plaintiff sent Runberg a letter, with a carbon copy to Phillips, requesting that Runberg inform her of the purpose of the meeting and the parties who were expected to attend. (*See* Diaconis

---

[6] According to Phillips, however, Phillips informed Runberg that plaintiff raised her voice at Phillips while they were in the presence of plaintiff's son, who was a student at Gardnertown. (*See* Diaconis Decl., Ex. P (Phillips Dep. at 66-67).)  Phillips thereafter requested the meeting with Runberg to discuss the fact that plaintiff disciplined her in the presence of a student. (*See id.*; Defs. Rule 56.1 Stmt. ¶ 4.)

Decl., Ex. C.)  Plaintiff requested that the administrative union delegate attend the meeting, but he

was unavailable and plaintiff therefore attended the meeting without union representation.  (*See*

Complt. ¶¶ 39-40.)   The meeting was attended by plaintiff, Phillips, Runberg and Gordon (in her

capacity as the teachers' union delegate).  (*See id.* ¶ 40.)  Although plaintiff claims that "Runberg

offered [her] no support [at the meeting] and allowed the clique of teachers to viciously attack her,"

(*see id.* ¶ 40), when testifying at her deposition regarding this specific meeting, she made no mention

of the manner in which Runberg handled the situation.  (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 51-

52).)

Around the same time, plaintiff also experienced a confrontation with Apuzzo, who

ultimately filed a written complaint against plaintiff as a result thereof.  (*See* Sussman Affm., Ex.

1 (Pl. Dep. at 64); Diaconis Decl., Ex. E.)  The confrontation arose from plaintiff's duty as Program

Specialist to develop the camera film of teachers who took photographs at student assemblies and

other events and to deliver the photographic prints to the respective teachers.  (*See* Sussman Affm.,

Ex. 1 (Pl. Dep. at 64, 66).)  Plaintiff claims, however, that upon becoming Assistant Principal, she

reassigned this task and was no longer responsible for it.[7]  (*See id.*)  To plaintiff's dismay, Apuzzo

sent plaintiff a note requesting her photographs which plaintiff characterized as "nasty" and

"demanding."  (*See id.*)  Plaintiff immediately reported the incident to Runberg, stating:

> I gave you the memo.  I'm the assistant principal, I don't go back and forth delivering
> film to the camera shop any more.  That's either the teacher's responsibility or
> somebody else's.

---

[7] It is unclear whether any administrators or staff were aware that plaintiff reassigned this
task.  (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 64-66).)  Although plaintiff claims that she informed
Runberg in a memorandum of the reassignment, she claims that he did not review it.  *See supra* pp.
5-6.

(*See id.* (Pl. Dep. at 66).)  Runberg told plaintiff not to "worry about the film."  (*See id.*)

When Apuzzo again asked plaintiff for her photographs, plaintiff requested a meeting with her in plaintiff's office.  (*See id.*)  After Apuzzo did not come to plaintiff's office, plaintiff went to her classroom and instructed her to excuse herself from her class to discuss the situation.  (*See id.*)  In the hallway outside of Apuzzo's classroom, plaintiff stated: "Mrs. Apuzzo, I do not deliver film any more.  I am the assistant principal.  I gave Mr. Runberg a memo stating that . . . ."  (*See id.*)  According to plaintiff, Apuzzo began screaming which was audible to the students inside the classroom and to another teacher and her class that were entering the building from recess.  (*See id.* (Pl. Dep. at 66-67).)  Plaintiff testified that she walked away and immediately reported the incident to Runberg who then discussed the incident with Apuzzo. (*See id.* (Pl. Dep. at 67).)  Runberg also requested to see the note that initiated the confrontation, but plaintiff refused to provide it to him and ultimately destroyed it.  (*See id.* (Pl. Dep. at 67-68).)

On December 10, 2001, Apuzzo filed a written complaint with Runberg as a result of this incident.  (*See* Diaconis Decl., Ex. E.)  She claimed that plaintiff "yelled at her in front of [her] students and colleague."  (*See* Diaconis Suppl. Decl., Ex. Z (Apuzzo Dep. at 41).)  In a letter to Runberg dated December 10, 2001, she wrote:

> I am writing to you regarding the incident in which I was spoken to unprofessionally by an administrator.  There seems to be an ongoing situation between me and Denise Woods that I need to make you aware of.  Attached is [sic] letter[8] that gives greater detail of numerous situations which I have experienced at Gardnertown School.  Some of the situations the letter is regarding are listed below. [(1)] Unprofessional conduct in front of students [(2)] Parental phone call not communicated back to teacher  [(3)] Incorrect information on referral letter [(4)] Lack of support in instructional areas [(5)] Lack of providing answers for questions on a regular basis

---

[8] Although this letter was apparently produced during discovery, (*see* Diaconis Suppl. Decl., Ex. Z (Apuzzo Dep. at 41)), it is not part of the record.

> . . . . [This] is certainly not the first time that I have found Denise to be unprofessional toward me. I work far to [sic] hard to be professional in my position, I do not think I am asking too much to expect the same from her.

(*See* Diaconis Decl., Ex. E.) On December 14, 2001, Gordon, acting as the NTA union delegate, also sent a letter to Runberg, signed by both Apuzzo and herself, requesting that Runberg place a "counseling memo" in plaintiff's file indicating that it is inappropriate to discipline teachers in the presence of students or staff. (*See id.*) It also requested that plaintiff "be advised that should another such incident occur, disciplinary action will be taken." (*See id.*) In response, Runberg sent Gordon a letter, dated December 20, 2001, with carbon copies to Apuzzo, plaintiff and Henderson,[9] indicating that they were all required to attend a meeting on January 3, 2002 and that Henderson will "assist with facilitating the meeting in a mediation style." (*See id.*) However, according to plaintiff, the day prior to the scheduled meeting, Runberg informed her that it was cancelled. (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 83); Pl. Rule 56.1 Stmt. ¶ 7.)

Plaintiff alleges that at the same time, she requested a meeting with district-wide administrators, and a meeting was subsequently held and attended by Johns, Mary Ellen Leimer ("Leimer"),[10] Mary Ann Joyce ("Joyce")[11] and Runberg.[12] (*See* Pl. Rule 56.1 Stmt. ¶ 6; Sussman Affm., Ex. 1 (Pl. Dep. at 70-71).) At the meeting, they discussed the incident involving plaintiff and

---

[9] Henderson was the Equal Employment Officer ("EEO") for the District. (*See* Diaconis Suppl. Decl., Ex. W (Johns Dep. at 147-48, 190).)

[10] Leimer is an administrator in the Human Resources department. (*See* Complt. ¶ 49.)

[11] Joyce was the Executive Director of Elementary Education. (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 71).)

[12] The record does not indicate when this meeting occurred nor whether Henderson attended. (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 71).)

Apuzzo, including the scheduled January 3rd meeting and Henderson's anticipated role as a mediator. (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 72).)  There was reference to a "four-page letter" written by Apuzzo that alleged several complaints against plaintiff.[13]  (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 72); Pl. Rule 56.1 Stmt. ¶ 6.)  When plaintiff realized that they were discussing a letter that she had never seen and did not know even existed, she felt "betrayed." (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 73).)  When she asked Runberg why she was not informed of this letter prior to the meeting, he said that he did not want to upset her.  (*See id.*)

Plaintiff alleges that despite the meeting with administrators, Apuzzo, Gordon and Phillips repeatedly attempted to undermine her authority while in the presence of parents and other teachers. For example, plaintiff alleges:

> On January 8, 2002, . . . Phillips, a teacher and a union delegate, ambushed and humiliated [me] by bringing up a non agenda topic at a Compact Meeting that included parents.  The topic that was improperly shoved into the discussion, once again, dealt with my job duties and the description of those duties.

(*See* Complt. ¶ 58.)  Moreover, the minutes to this meeting, contrary to normal practice, were placed in each teacher's mailbox, which, according to plaintiff, was "done in order to further embarrass and humiliate . . . plaintiff . . . ." (*See id.* ¶ 64.)  Plaintiff asserts that subsequently, on January 16, 2002, parents confronted her and asked her to explain the role of the Assistant Principal; for example, one parent, a friend of Apuzzo, Gordon and Phillips, inquired, "Do you just walk around in heels and smile?" (*See id.* ¶ 61.)  Plaintiff alleges that Runberg failed to take any remedial action with respect to Phillips's actions at the Compact Meeting, the distribution of the minutes to the teaching staff and

---

[13] The four-page letter allegedly discussed at this meeting seems to be the letter referenced in Apuzzo's December 10, 2001 letter to Runberg.  *See supra* p. 8, 8 n.8.

the parent's subsequent comment.[14]  (*See id.* ¶¶ 61, 65.)  Additionally, on February 27, 2002, the

faculty and staff established a committee to discuss issues regarding the school administration,

including the effectiveness of the position of Assistant Principal.  (*See id.* ¶ 72.)  According to

plaintiff, Runberg approved this topic of discussion, thereby undermining her authority in the

presence of the faculty and staff.  (*See id.*)

As tension grew between plaintiff and Apuzzo, Gordon and Phillips, Runberg scheduled two

meetings with plaintiff to discuss her role as an administrator and other related issues.  Runberg

notified plaintiff that she was obligated to attend a meeting on April 19, 2002, but plaintiff "refused

to attend."  (*See* Defs. Rule 56.1 Stmt. ¶ 9; Pl. Rule 56.1 Stmt. ¶ 9; Complt. ¶¶ 88-89.)  Plaintiff

alleges:

> On April 19, 2002, [w]hen [plaintiff] arrived at her office on this day the agenda [for
> the meeting with Runberg] was on her chair.  The agenda stated the topics to be:
> Administrator's Role and "Other." [Plaintiff], based on previous meetings, knew that
> "Other" was a code to ambush and attack her at will. [Plaintiff] informed Principal
> Runberg that she refused to attend the meeting and discuss her role again with the
> "clique."  She further stated that she was aware that he was her supervisor and that
> refusing to attend the meeting is an act of insubordination, but that she could not be
> publicly humiliated again in front of the "clique" of teachers. . . . Principal Runberg
> stated that if [plaintiff] did not attend the meeting he would be forced to write [her]
> up. [Plaintiff] responded by stating: ["]Please make sure that I get a copy.["]

(*See* Complt. ¶¶ 88-89; Pl. Rule 56.1 Stmt. ¶ 9.)

Runberg did not take disciplinary action against plaintiff at this time, but scheduled another

meeting on May 13, 2002, of which he notified plaintiff by letter dated May 1, 2002. (*See* Diaconis

---

[14] Similarly, plaintiff asserts that, at a parent-teacher meeting on February 5, 2002, Phillips
criticized an enrichment program that plaintiff initiated.  (*See* Complt. ¶ 69.)  When Apuzzo, Gordon
and Phillips informed Runberg in the presence of plaintiff that the enrichment program interrupted
their class schedules and was not useful, plaintiff defended the program but he "act[ed] as if [she]
was invisible."  (*See id.* ¶¶ 80-81.)

Decl., Ex. H; Pl. Rule 56.1 Stmt. ¶ 10.)  However, plaintiff again failed to attend, even after being

warned that her absence would constitute insubordination.  (*See* Defs. Rule 56.1 Stmt. ¶ 10; Pl. Rule

56.1 Stmt. ¶¶ 9-10; Complt. ¶ 93.)   Plaintiff claims that she did not attend because Runberg

scheduled the meeting at a time when her attorney was unable to attend, despite Runberg's promise

that she "could have a representative of her choice" at the meeting.[15]  (*See* Complt. ¶¶ 90-91; Pl. Rule

56.1 Stmt. ¶ 10.)   Plaintiff alleges:

> Runberg came to [plaintiff's] office and said sarcastically, "I suggest you attend this
> meeting.  If you don't, I'm writing you up on insubordination."  [Plaintiff] responded
> that she would not attend without legal representation.  Principal Runberg then
> stated: "Fine you'll get an insubordination letter in your file."

(*See* Complt. ¶ 93.)  The meeting nonetheless proceeded in the absence of plaintiff and was attended

by Apuzzo, Gordon, Phillips, Runberg, Henderson and Frank Colone, the teachers' union delegate.

(*See id.* ¶ 94.)  Plaintiff was extremely upset that they met in her absence.  (*See id.* ¶ 95.)

On May 14, 2002, Runberg sent plaintiff a letter indicating that her absence at the April 19th

and May 13th meetings constituted insubordination.  (*See* Diaconis Decl., Ex. I.)  The letter stated:

> On two occasions, April 19 and May 13, 2002, I have requested that you attend
> meetings with teachers and myself.  The meetings have been planned to address the
> concern of the teachers.  On both occasions you have refused to attend.  These
> actions constitute insubordination and will lead to disciplinary action.  This
> document is to be placed in your employee personnel file. . . .

(*See id.*)

Shortly thereafter, on May 23, 2002, plaintiff made her first complaint to Johns that she was

being subjected to harassment by Apuzzo, Gordon and Phillips and that Runberg was unsupportive

and ineffectual in handling her complaints regarding their behavior.  (*See* Pl. Rule 56.1 Stmt. ¶ 11;

---

[15] Plaintiff first retained counsel in connection with the problems at Gardnertown in May
2002.  (*See* Diaconis Decl., Ex. T (Pl. Dep. at 227-29).)

Complt. ¶ 96.)  However, she did not charge that the harassment was racially motivated.[16]  She also requested a transfer to North Junior High School, and, according to plaintiff, Johns responded: "Denise just hang in there until the end of June.  If a position opens in North, I'll put you there." (*See* Pl. Rule 56.1 Stmt. ¶ 11; Complt. ¶ 96.)  However, when such a position became available, plaintiff was not transferred because, according to Johns and Dupree, the District did not want to transfer plaintiff while she had unresolved personnel issues at Gardnertown, particularly in light of the fact that North Junior High School needed a strong administrator.  (*See* Diaconis Suppl. Decl., Ex. Y (Dupree Dep. at 16-17); Diaconis Reply Decl., Ex. A (Johns Dep. at 32); Diaconis Reply Decl., Ex. C (Dupree Dep. at 70).)  Instead, the District transferred a Caucasian female, who was previously a Program Specialist with the District.  (*See* Pl. Affm. ¶ 7; Diaconis Reply Decl., Ex. A

---

[16] Apparently, plaintiff did not complain of racial discrimination to Johns at or prior to this time.  Indeed, on May 29, 2002, after plaintiff complained to Johns of harassment, plaintiff sent him a letter with the subject line "Harassment," but failed to mention any incidents of racial discrimination or hostility.  (*See* Diaconis Decl., Ex. J.)  Instead, the memorandum discussed an incident in which Runberg notified plaintiff that several teachers complained that she recognized a substitute teacher at a teachers' awards ceremony.  (*See id.*)  Plaintiff wrote:

> Considering the abusive attendance record of our contractual teaching staff, I greatly value the significant role substitute teaching personnel play in our instructional process.  I am appalled that Mr. Runberg would bring something like this to my attention because a select group of teachers (the same group that has been harassing me (through him) from the day I stepped on Gardnertown soil,[]) are complaining about a program that I created.  I think you would agree that I have a right to decide who is worthy of being appreciated.  What harm was done?  Who did I offend?  Yet in spite of everything, I have been labeled the "escalator" of events by my supervisors.

(*See id.*)  Similarly, when plaintiff testified at her deposition regarding her meeting with Johns, she did not state that she reported any incidents of racial discrimination or hostility.  (*See* Sussman Affm., Ex. 1 (Pl. Dep. at 102).)  Moreover, plaintiff asserts in her Memorandum of Law, Rule 56.1 Statement and Verified Complaint that they merely discussed that Apuzzo, Gordon and Phillips were harassing her and not that she believed it was because of her race. (*See* Pl. Mem. Opp. Summ. J. at 9-10; Pl. Rule 56.1 Stmt. ¶ 11; Complt. ¶ 96.)

(Johns Dep. at 34).)

In addition to reporting the alleged harassment to Johns, plaintiff met with Runberg and Henderson on at least two occasions in May or June of 2002.  (*See* Pl. Rule 56.1 Stmt. ¶ 11; Defs. Rule 56.1 Stmt. ¶ 11; Diaconis Decl., Ex. F (Henderson Dep. at 41-42).)  At these meetings, Henderson advised plaintiff "on how to address some of the problems at the school and also . . . to try to mediate with the teachers."  (*See* Diaconis Decl., Ex. F (Henderson Dep. at 42).)  Henderson also encouraged plaintiff to work more closely with Runberg. (*See* Diaconis Decl., Ex. F (Henderson Dep. at 42); Pl. Rule 56.1 Stmt. ¶ 11; Pl. Affm. ¶ 3.)  Henderson and plaintiff also had multiple phone conversations during which they discussed plaintiff's allegations of harassment and, on at least one occasion, plaintiff, her husband and Henderson all met to discuss "the treatment that [plaintiff] was receiving from the white teachers in her school."  (*See* Diaconis Decl., Ex. F (Henderson Dep. at 24); Pl. Affm. ¶ 3; Sussman Affm., Ex. 11 (L. Woods Dep. at 101).)  Plaintiff claims that Henderson said that she also faced racism when she became an administrator.  (*See* Pl. Affm. ¶ 3.)  Henderson, however, denies that she ever said this, and testified that they never discussed race or anything that may have suggested that the harassment alleged by plaintiff was racially motivated.  (*See* Diaconis Decl., Ex. F (Henderson Dep. at 28).)

Shortly after plaintiff complained to Johns, Larry Woods ("Woods"), plaintiff's husband, who was an administrator at Gardnertown, informed Johns that a group of Caucasian teachers and Runberg were racially discriminating against plaintiff.  (*See* Diaconis Suppl. Decl., Ex. W (Johns Dep. at 133); Diaconis Suppl. Decl., Ex. AA (L. Woods Dep. at 176); Sussman Affm., Ex. 11 (L. Woods Dep. at 61-65); Pl. Mem. Opp. Summ. J. at 9.)  Specifically, during a meeting regarding minority recruitment, Woods publicly questioned the District's efforts in recruiting minorities by

making reference to the fact that certain Caucasian teachers were discriminating against plaintiff on the basis of her race.  (*See id.*)  Woods testified:

> There was a discussion about recruiting minority candidates in the district.  I indicated to Dr. Johns at that meeting, I said, "This is a district that is actively attempting to recruit minorities, but once they get here, you give them no support.  Dr. Johns stated, "What do you mean by that?"  I stated very firmly and very strongly, I said, "My wife, who is an African American female assistant principal at Gardnertown is being abused on a regular basis by a small clique of Caucasian teachers in the building."  At that point in time, since we were in a meeting Dr. Johns said, "Well, if you're going to say something like that, we should talk about this privately."

(*See* Sussman Affm., Ex. 11 (L. Woods Dep. at 62); Diaconis Suppl. Decl., Ex. W (Johns Dep. at 184-85, 186-87, 189); Am. Complt. ¶ 5.)  Subsequently, Woods met privately with Johns and stated to him:

> "there is no secret in this district that my wife is being abused at Gardnertown.  It is clear that there is a small clique of teachers who do not want to report to her because she is an African American assistant principal.  She is the first ever African American administrator in the history of that school."[17]  I said, "When she was a program specialist she had some problems, but the day that she was appointed with ten other assistant principals including myself, she has been under constant attack."

(*See* Sussman Affm., Ex. 11 (L. Woods Dep. at 63-64).)[18]

---

[17]Although Woods's testimony indicates that plaintiff was the first African American administrator at Gardnertown, the overall District had several "black" or "Hispanic" administrators prior to and during the time plaintiff was Assistant Principal.  For example, in 2003, the District had twenty-four Assistant Principals, ten of which were "black" or "Hispanic." (*See* Diaconis Decl., Ex. O.)

[18] It is unclear whether plaintiff was at this meeting when Woods complained to Johns that certain teachers were discriminating against plaintiff on the basis of her race.  During Woods's testimony regarding this meeting, he did not mention whether plaintiff was present.  (*See* Sussman Affm., Ex. 11 (L. Woods Dep. at 61-65).)  Johns testified, however, that plaintiff initially attended the meeting, but was not present when Woods complained of racial discrimination.  (*See* Sussman Affm., Ex. 12 (L. Woods Dep. at 134-36).)

Notably, Johns and Woods's testimonies differ on the substance of this meeting.  In

Johns reported Woods's complaints to Henderson, Dupree and Runberg.  (*See* Diaconis Suppl. Decl., Ex. W (Johns Dep. at 147-48, 190, 193).)  According to Johns, Henderson, an African American Assistant Superintendent, conducted an investigation and discussed the situation with Apuzzo, Runberg and plaintiff.  (*See* Diaconis Aff'm, Ex. S (Johns Dep. at 147-48).)  Johns testified that Henderson ultimately found that plaintiff's problems at Gardnertown were unrelated to race.  (*See* Diaconis Decl., Ex. S (Johns Dep. at 147-48).)  He also testified that Henderson reported that plaintiff's problems were largely caused by herself.  (*See id.* (Johns Dep. at 148).)  Dupree, another African American Assistant Superintendent, testified that he discussed the situation with Runberg to determine whether Runberg had acted appropriately to support plaintiff.  (*See* Diaconis Suppl. Decl., Ex. Y (Dupree Dep. 17-18).)  Dupree explained:

> And what I do remember about that is wanting to get a real clear feeling that Mr. Runberg had done what I thought the right thing to do in terms of supporting an administrator that was having trouble with a staff person.  Particularly a minority in an environment like that.  I wanted to make sure that Mrs. Woods wasn't let to – wasn't – that she had gotten her fair support in that situation. . . . [A]nd over time I recall feeling that she had gotten fair support. . . . [A]fter a while I began to feel that Denise wasn't putting out the effort that I would like her to put out in order to resolve this conflict with the teachers.

(*See id.* (Dupree Dep. at 17-18, 67-68).)

Plaintiff alleges that despite the complaints and the subsequent meetings, Apuzzo, Gordon and Phillips continued to harass her and question her authority in the presence of Runberg and

---

particular, Johns testified that Woods informed him that "there were racial overtones to [plaintiff's] situation[,]" and when Johns asked Woods to be more specific, Woods responded that "race is always at the bottom of things."  (*See* Diaconis Suppl. Decl., Ex. W (Johns Dep. at 134).)  Additionally, Johns testified that both Henderson and Dupree informed him that Woods was "way too aggressive [when advocating for his wife,] . . . "had to be coach[ed] . . . to not be physically present at Gardnertown[, and] . . . was not in control of himself."  (*See* Diaconis Suppl. Decl., Ex. W (Johns Dep. at 188, 191-92).)

others, and Runberg continued to ineffectually handle the situation.  For example, in May 2002, Apuzzo and another teacher[19] failed to attend a recognition ceremony organized by plaintiff.  (*See* Complt. ¶ 107.)  Plaintiff withheld their certificates of recognition that were presented to the teachers in attendance and requested that Runberg initiate disciplinary action against them for their absence from the ceremony.  (*See id.*)  Runberg ultimately directed plaintiff to give the teachers their awards and did not discipline the teachers for their failure to attend.  (*See id.*)

Plaintiff also alleges that although she expected to deliver a speech at the sixth grade graduation in June 2002, she was omitted from the program to do so.  (*See id.* ¶ 115.)  When she asked Runberg why she was omitted, he said "I'll look into it."  (*See id.*)  She also claims that at the graduation ceremony, Runberg requested that she handle a disciplinary problem immediately before calling her to the podium to present an award.  Plaintiff claims that "[t]his was an[] attempt to make [her] look bad in public. . . . Clearly, Principal Runberg tried to make it appear as if [plaintiff] was AWOL from the graduation ceremony as well as to publicly humiliate her."  (*See id.* ¶¶ 118-19.)

In July 2002, Runberg issued plaintiff her year-end evaluation which, according to plaintiff, was merely reflective of the opinions of "the 'clique' of teachers" and "consist[ed] of all lies."  (*See id.* ¶¶ 120, 122.)  Plaintiff alleges that "[t]o further humiliate and treat her like a child, Principal Runberg read the false and inaccurate evaluation to her."  (*See id.* ¶ 120.)  The evaluation stated that plaintiff:

> has shown an unwillingness to meet with several teachers who have expressed their displeasure in the way [plaintiff] has handled several situations.  This lack of communication has impaired her ability to manage, lead, and make decisions for the

---

[19] The other teacher who failed to attend the recognition ceremony was Beverly Woods, an African American, who also complained to Runberg about plaintiff's behavior towards her.  (*See* Diaconis Decl., Ex. D (Runberg Dep. at 103-05).)

entire faculty effectively.  On two occasions, April 19 and May 13, 2002, [plaintiff] was asked to meet with several teachers that expressed a continued concern over the unresolved issues. [Plaintiff] was asked to attend this meeting and she refused to attend. . . . [Plaintiff's] refusal to meet and discuss the ongoing problems that has arisen between herself and certain faculty members has created an atmosphere of division in the building.  These actions are contrary to an effective school climate that is conducive to learning.  [Plaintiff] must be responsive to all teachers' needs and concerns regardless of personal feelings toward certain individuals.  Teachers have commented that they do not like the feeling in the school. . . . [Plaintiff] has shown her creativity in that she developed the monthly appreciation assemblies this year. . . . This, however, was not without controversy.  Several teachers were slighted when they did not received [sic] their certificates of recognition.  Here is an example how [plaintiff's] lack of communication is causing a division within the school community.  There was also concern over one of the substitutes receiving a certificate of appreciation and other substitutes not receiving any kind of recognition. [Plaintiff] needs to set up the parameters of the programs and then follow through in a fair and consistent manner. . . . [Plaintiff] has taken many parents on tours of our school.  She has done a fine job in presenting the school in a positive fashion. . . .  There is some concern over [plaintiff's] attendance.  On two occasions, one in December and the other in May, [plaintiff] was away from her assistant principal duties.  This concern arises in the fact that you can not supervise the employees if you are not there.  This is a poor model for the teachers.

(*See* Diaconis Decl., Ex. K.)  Plaintiff was thereafter placed on a corrective action plan to improve her performance as Assistant Principal.  (*See id.*)  At the same time, in order to, *inter alia*, "develop a more cohesive administrative team with the plaintiff," Johns instructed Henderson to place Runberg on a corrective action plan as well.  (*See* Defs. Rule 56.1 Stmt. ¶ 14; Pl. Rule 56.1 Stmt. ¶ 14; Diaconis Decl., Ex. F (Henderson Dep. at 69).)

Plaintiff rebutted Runberg's evaluation of her in a five-and-a-half page memorandum.  She wrote in pertinent part:

I am extremely alarmed by the contents of this evaluation.  I cross referenced this evaluation with one given to me earlier and find the drop in performance over a two month period to be incredible.[20]   Additionally, there is little in the evaluation to

_____

[20] Plaintiff received an overall favorable evaluation for the time period of August 2001 to February 2002.  (*See* Diaconis Decl., Ex. G.)

indicate that it is both retrospective and prospective in its scope. The evaluation scope is limited and the cited incidents seem to pertain to only one area of my responsibility. What about dependability? Does my dependability only extend to the limited area of escorting parents on tours and submitting completed evaluations on a timely basis (the only positive areas mentioned in my evaluation)? Why doesn't my evaluation focus on more of the positive? . . . Finally, no provisions were made to include my input to negate the allegations against me and influence the outcome of the final product. By publicly and privately failing to consider my point of view and my written documentation to offset these accusations represents the act of being arbitrary and capricious. Clearly, you played the role of arresting officer, judge and jury in presenting the "facts" in this evaluation. We are supposed to be an administrative team that is fortified by our desire to conceal our differences from the staff that we supervise to prevent them from exercising divisive tactics. . . . [Y]ou are making claims but there is no written documentation to support the accusations. However, a close review of this evaluation will reveal that its contents mirrors the concerns stated in a letter (see attached) from a teacher that was placed in my file by you without my knowledge.[21] **(As your administrative partner, how did you allow this to happen?)** I inadvertently became aware of the letter when I was looking through my file for a copy of my college transcript. . . . [With regard to absenteeism,] [a]re you saying that in a whole year, that a two-occasion absenteeism event discounted my ability to supervise and that I'm setting a poor example for the teachers? Is this not a district where teacher absenteeism is abusive? . . . For the record, I have documentation to cover every absence, however, you never requested or indicated that my absence was a problem.[22] "Teachers have commented that they do not like the feeling in the school." How dare you try and blame the school climate on one person. There was division in the school when I walked in as a Program Specialist during my first year in the district. It was out of your mouth that you warned me of division in the school. Additionally, you warned me that there were certain teachers in the school who would resist reporting to me. . . . You totally ignored input and took this select group of teachers' word at face value. . . .

---

[21] The attached letter referenced by plaintiff was written by Gordon and alleged that plaintiff wrongfully withheld recognition awards from two teachers in "another attempt . . . to belittle and humiliate staff members." (*See* Diaconis Decl., Ex. J.)

[22] Plaintiff claims that Runberg's remarks regarding her absenteeism were merely designed to "produce a paper trail." (*See* Complt. ¶ 128.) Similarly, according to plaintiff, when she returned from a four-week vacation, she received a letter, which Runberg had left on her desk, indicating that she failed to sign her evaluation prior to leaving for her vacation. (*See id.* ¶ 129.) However, plaintiff claims that Runberg failed to notify her that she was required to return the signed evaluation by any particular time and that he gave her the evaluation fifteen minutes before she intended to leave for vacation, purposefully preventing her from reviewing and signing it prior to the start of her vacation. (*See id.* ¶¶ 130-31.)

(*See* Diaconis Decl., Ex. K (bold in original).)

Despite the District's decision to place Runberg and plaintiff on corrective action plans, conflict continued.  For example, according to plaintiff, John Ricker ("Ricker"), a physical education teacher, called for an administrator to assist in handling a fight which erupted in the gymnasium. (*See* Complt. ¶ 137.)  When plaintiff received the phone call, Apuzzo was present and followed plaintiff to the gymnasium.  (*See id.*)  When plaintiff arrived, Apuzzo "ran in front of [plaintiff] and grabbed the student while [plaintiff] was conducting her investigation."  (*See id.*)  According to plaintiff, Ricker was visibly upset and stated, "I called for an administrator to handle the situation. I don't believe it."  (*See id.*)

A meeting was scheduled to discuss this incident and was attended by plaintiff, Ricker, Runberg, Apuzzo and Henderson.  (*See id.* ¶ 138.)  At this meeting, Apuzzo stated, "Listen Mr. Runberg, I thought you said that she was going to be gone this year.  I don't want to deal with her because I have no respect for her. . . . Correction, I have absolutely no respect for you whatsoever." (*See id.* ¶¶ 138-39.)  To plaintiff's dismay, neither Runberg nor Henderson reprimanded Apuzzo for her remarks.  (*See id.*)

Plaintiff claims that she thereafter continued to be subjected to various incidents of harassment.  For example, she alleges that:  (1) nobody sent her get-well cards when she was out on medical leave;[23] (2) she was not thanked for completing work while on leave; (3) Runberg "question[ed] her" when she requested time off to attend chiropractor appointments upon her return from medical leave; (4) she requested a laptop from Runberg and never received it; (5) her name was

_____

[23] Plaintiff was on medical leave from December 16, 2002 to March 7, 2003 as a result of a back injury that she suffered while at work handling a discipline problem.  (*See* Complt. ¶ 140.)

omitted from the June 2003 graduation ceremony; and (6) Runberg failed to complete her performance evaluations in a timely fashion and provided "lame" excuses therefor. (*See* Complt. ¶¶ 140-51.)

Subsequently, on July 18, 2003, plaintiff received her performance evaluation covering the periods of July 1, 2002 to March 31, 2003 and April 1, 2003 to June 30, 2003. In the evaluation for the latter period, Runberg wrote:

> The second half of the school year produced no areas of conflict like those that were evident earlier in the school year. This does not mean that there were no hard feelings among the faculty and staff. There is an uneasy acceptance by both sides. Again, [plaintiff] needs to address any and all conflicts that should arise in the future.

(*See* Diaconis Suppl. Decl., Ex. R.)

Upon receiving her performance evaluation, plaintiff was seriously upset and called Johns to file a complaint against Runberg regarding the content of the evaluation.[24] (*See* Diaconis Suppl. Decl., Ex. X (Pl. Dep. at 126); Complt. ¶ 153.) While she claimed that the evaluation was patently untrue and merely reflected the sentiments of Apuzzo, Gordon and Phillips, (*see* Complt. ¶ 152; Diaconis Suppl. Decl., Ex. X (Pl. Dep. at 126)), there is no evidence in the record that plaintiff at this time informed Johns that she believed that the evaluation evidenced racial bias or animus on the part of Runberg. (*See* Pl. Mem. Opp. Summ. J. at 10; Pl. Rule 56.1 Stmt. ¶ 17; Pl. Affm. ¶ 5; *see generally* Diaconis Decl., Ex. T; *see generally* Diaconis Suppl. Decl., Ex. X; *see generally* Sussman Affm., Ex. 1.) According to plaintiff, Johns instructed plaintiff to leave the evaluations on his desk and to "gather all information related to her job and responsibilities." (*See* Complt. ¶ 153; *see also*

---

[24] Plaintiff also called Edward Mucci, President of the Administrators Union, who informed her that Runberg stated that she was not "a good match for him as an administrative partner." (*See* Diaconis Suppl. Decl., Ex. X (Pl. Dep. at 126); Complt. ¶ 156.)

Diaconis Decl., Ex. T (Pl. Dep. at 130).)  She believed that Johns intended for her to "make copies of anything that was [her] work," including [m]emos, teacher evaluations, discipline bus referrals," etc.  (*See* Diaconis Decl., Ex. T (Pl. Dep. 130).)  Johns told plaintiff that he would contact her on July 21, 2003, the next business day, to discuss the performance evaluations and her objections thereto.  (*See* Complt. ¶ 165; Diaconis Decl., Ex. T (Pl. Dep. at 239).)[25]

Plaintiff thereafter directed two school employees, Nicole Duquette and Gloria C. Valle, to copy various documents that were stored in file cabinets in Runberg's office and the main office on which plaintiff's name appeared.  (*See* Diaconis Decl., Ex. T (Pl. Dep at 230); Diaconis Suppl. Decl., Ex. BB (Duquette Dep. at 7); Diaconis Reply Decl., Ex. D (Valle Dep. at 24-25).)  Runberg was on vacation at the time, and plaintiff used a key to unlock the cabinets to access the documents.  (*See* Diaconis Reply Decl., Ex. D (Valle Dep. at 25-27).)  At plaintiff's direction, Duquette and Valle spent approximately two days photocopying and binding the records, which included teacher observations, student discipline records and memoranda on various subjects.  (*See* Diaconis Decl., Ex. T (Pl. Dep. at 132-33, 139); Diaconis Suppl. Decl., Ex. BB (Duquette Dep. at 7); Diaconis Reply Decl., Ex. D (Valle Dep. at 25-31).)  During these two days, plaintiff never informed Duquette that she was acting pursuant to Johns's direction.  (*See* Diaconis Suppl. Decl., Ex. BB (Duquette Dep. at 8).)

On July 23, 2003, plaintiff brought the bound copies home so that she would have them if

---

[25] Woods also spoke on the telephone with Johns at this time regarding the alleged mistreatment to which plaintiff was subjected.  (*See* Diaconis Suppl. Decl., Ex. AA (L. Woods Dep. at 197).)  The record seems to suggest that Woods indicated to Johns that the harassment was racially motivated.  (*See id.*)

Johns called her to discuss the performance evaluations.[26]  (*See* Diaconis Decl., Ex. T (Pl. Dep. at 239); Defs. Rule 56.1 Stmt. ¶ 17; Pl. Rule 56.1 Rule Stmt. ¶ 17; Pl. Affm. ¶ 6; Diaconis Reply Decl., Ex. D (Valle Dep. at 103).)  To plaintiff's dismay, however, Johns never contacted her.  (*See* Pl. Affm. ¶ 5; Am. Complt. ¶ 11.)  Thereafter, plaintiff began to experience severe psychological problems.  She alleges that "[o]n . . . August 16, [2003, she] became overwhelmed and she began crying hysterically, shaking and rattling on and on about her job."  (*See* Complt. ¶ 173.)

Plaintiff sought psychiatric treatment in August 2003 and was treated by Dr. Albert Crum ("Crum"), who diagnosed her with Post Traumatic Stress Disorder ("PTSD").  (*See* Pl. Affm. ¶ 5; Diaconis Aff'm, Ex. M.)  Plaintiff claims that she developed PTSD because of "the constant chipping away of her humanity and dignity by [defendants] and the clique of teachers." (*See* Complt. ¶ 175.) By letter dated August 17, 2003, Crum informed the District that plaintiff was suffering from serious PTSD and she was unable to return to work at that time and that he would update the District on her condition in thirty days.  (*See id.* ¶ 175; Diaconis Decl., Ex. M.)  Defendants attempted to contact plaintiff several times while she was absent from work, which, according to plaintiff and Crum, caused her severe emotional distress.  (*See* Complt. ¶¶ 177-78; Diaconis Decl., Ex. M.)

On October 15, 2003, Crum informed Johns by letter that plaintiff was still suffering from PTSD and that she was unable to return to work for another 30 days.  He also indicated that he "was surprised that [his] professional request that [Johns] contact [his] office in writing with any questions or requests for any information was ignored and that [Johns] went directly to the Client who [was] in an extremely fragile state."  (*See* Diaconis Decl., Ex. M.)  Crum requested that Johns contact

---

[26] However, Johns did not know that she would be on vacation at that time and, in any event, had never previously contacted her at home.  (*See* Diaconis Decl., Ex. T (Pl. Dep. at 239, 241).)

Crum or plaintiff's attorney Rudolph Silas if he had any questions.[27]  (*See id.*)

While plaintiff was absent from work, the District requested  Wilbert Knight ("Knight"),[28] an African American, to commence an investigation into plaintiff's alleged use of school personnel to copy student records prior to her departure in July 2003. (*See* Diaconis Suppl. Decl., Ex. DD (Knight Dep. at 39).)  Knight began his investigation in late September and interviewed Runberg, Johns, Duquette and Valle.  (*See* Diaconis Suppl. Decl., Ex. DD (Knight Dep. at 48); Diaconis Reply Decl., Ex. D (Valle Dep. at 41).)  Knight concluded the investigation in late November and reported to Johns and District counsel.   (*See* Diaconis Suppl. Decl., Ex. DD (Knight Dep. at 39).) Incidentally, Johns did not mention Knight's investigation when testifying about his decision to recommend plaintiff's termination to the District's Board of Education (the "Board").

By letter dated December 18,  2003, Johns informed plaintiff that he intended to recommend to the Board that her employment be terminated effective on March 1, 2004, and that the Board would act upon his recommendation at its meeting on January 27, 2004.  (*See* Diaconis Decl., Ex. N.)  By letter dated January 6, 2004, plaintiff's attorney, Rudolph Silas, Esq., requested a written explanation detailing the reasons underlying Johns's recommendation to the Board to terminate plaintiff.  (*See id.*)  By letter dated the same day, Johns informed plaintiff of the following:

> 1. You exercised poor judgment in the use of School District resources when you directed clerical staff members assigned to Garndertown School to spend several hours each over a two day period copying student records and teacher personnel

---

[27] Plaintiff pursued credits toward a doctorate degree while she was absent.  (*See* Defs. Rule 56.1 Stmt. ¶ 18; Pl. Rule 56.1 Stmt. ¶ 18.)  Plaintiff claims that she did so at the advice of her psychiatrist.  (*See id.*)

[28] The record does not indicate what position Knight held within the District.  Knight testified, however, that he has conducted investigations into employee misconduct on behalf of the District on several occasions.  (*See* Diaconis Suppl. Decl., DD (Knight Dep. at 74).)

records without any prior administrative approval and for no apparent school related purpose.  2. You exercised poor judgment when you had student records copied without parental consent.  The copying of student records for review and or use without parental consent, unless there is business necessity constitutes a violation of the Family Educational Right to Privacy Act [("FERPA")].  3. You exercised poor judgment when you removed School District property, student records and staff personnel records without there being a business of necessity.

(*See id.*)

Plaintiff thereafter requested the District to send her the policy pursuant to which she was terminated, but the District did not respond.  (*See* Pl. Affm. ¶ 6, Ex. 1.)  Plaintiff claims that the District did not have a policy regarding the copying of student records at that time and did not adopt such a policy until January 29, 2004, shortly after she was notified of her intended termination.[29] (*See* Pl. Mem. Opp. Summ. J. at 13; Sussman Affm., Ex. 9.)  Plaintiff also claims that prior to this incident, it was customary for administrators, including herself, to make copies of student records in order to maintain a work portfolio, and that the District never took any sort of disciplinary action in connection therewith.   (*See* Pl. Affm. ¶ 6; Diaconis Decl., Ex. T (Pl. Dep. at 229).)  In fact, plaintiff claims that she once presented such a portfolio containing copies of student records to Henderson. (*See* Sussman Affm., Ex. 11 (L. Woods Dep. at 100-01).)  Plaintiff also notes that after the District became aware that she took the documents off school premises, the District never

---

[29] Plaintiff submitted in evidence a memorandum from Joan Crosson, who is a Principal of a high school within the District, to Mary Lou Botsford, the District Clerk, dated February 11, 2004, indicating that the Board adopted a "Student Privacy Rights Policy" on January 29, 2004.  (*See* Sussman Affm., Ex. 9.)  Contrary to plaintiff's suggestion, however, this is not evidence that the District did not have a policy regarding the privacy of student records at the time of her termination. Indeed, the record contains a policy regarding the privacy of student records that the District adopted on April 27, 1982 and most recently revised on September 30, 2003.  (*See* Saturnelli Aff., Ex. C.) In any event, the District never claimed that plaintiff was terminated pursuant to any particular policy.  Rather, the District has always maintained that it terminated plaintiff because she exercised poor judgment and violated federal law.  (*See* Diaconis Decl., Ex. N.)

questioned her regarding the incident, never informed her that she may have violated District policy or federal law nor demanded that she return the documents. (*See* Am. Complt. ¶¶ 14-15; Diaconis Suppl. Decl., Ex. DD (Knight Dep. at 74); Pl. Affm. ¶ 6.)  As indicated by Johns, plaintiff's employment was terminated on March 1, 2004. (*See* Diaconis Suppl. Decl., Ex. W.)

In April 2004, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging employment discrimination on the basis of her race.  The EEOC issued plaintiff a Right to Sue letter dated April 12, 2004.  (*See* Diaconis Suppl. Decl., Ex. V.)  Plaintiff then filed the instant action on July 9, 2004. (*See generally* Complt.) On February 6, 2006, after the parties conducted substantial discovery, the District moved for summary judgment on all counts.  Plaintiff thereafter requested leave to amend her Verified Complaint to add Johns as a defendant, and, on September 15, 2006, with the Court's permission, plaintiff filed her Amended Complaint.  On December 12, 2006, defendants supplemented their summary judgment motion originally filed on February 6, 2006.  The motion is now fully submitted for this Court's resolution.

Subsequent to the filing of this lawsuit, however, the District failed to terminate two administrators who, like plaintiff, allegedly violated FERPA, which plaintiff claims is evidence of disparate treatment.  (*See* Pl. Affm. ¶ 8.)  Specifically, in June 2005, the District sent plaintiff and Woods a post card at their residence disclosing that their son had failed a school examination.  (*See* Sussman Affm., Exs. 6-7; Pl. Affm. ¶ 8; Saturnelli Aff. ¶ 2.)  As a result, on February 8, 2006, Woods filed a complaint with the United States Department of Education which subsequently found that the District had violated FERPA by sending a postcard in the mail with their child's grade in plain sight.  (*See* Sussman Affm., Exs. 7-8; Pl. Affm. ¶ 8; Saturnelli Aff. ¶¶ 2-3.)  Dr. Annette Saturnelli ("Saturnelli"), the District's Superintendent at the time, investigated the matter and

26

directed the Principal, Peter Copeletti ("Copeletti"), a Caucasian, and then Assistant Principal, Alan

Fairey ("Fairey"), an African American, to cease and desist from disseminating grades in that manner

and to begin using a method of notification that ensured student privacy. (*See* Saturnelli Aff. ¶ 2.)

Although the District did not terminate Copeletti or Fairey, they were both issued a "letter of

reprimand" which was placed in their respective personnel files. (*See id.*, Ex. B.)  According to

Saturnelli, the District did not terminate either administrator because, unlike plaintiff, they were

tenured employees and "the school had a practice in existence for several years of mailing grades out

in this manner which practices pre-dated . . . Copeletti's and . . . Fairey's involvement in the matter."

(*See id.* ¶¶ 3-4.)


## DISCUSSION

### I.   <u>Legal Standard</u>

It is axiomatic that "'at the summary judgment stage the judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial.'"  *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir.

2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  Accordingly, under FED.

R. CIV. P. 56, a motion for summary judgment may only be granted "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a  judgment as a

matter of law."  "A fact is considered 'material' for purposes of Rule 56 if it 'might affect the

outcome of the suit under the governing law.'"  *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 404

(S.D.N.Y. 2006) (quoting *Anderson*, 477 U.S. at 248).  The burden rests on the movant to

demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). At this stage of litigation, the court's role is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994). In doing so, the court must resolve all ambiguities and draw all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255.

"'Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.'" *Hill v. Rayboy-Brauestein*, No. 02-CV-3770, 2006 WL 3298383, at *5 (S.D.N.Y. Nov. 9, 2006) (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)). The nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Bush*, 452 F. Supp. at 405 ("In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on 'the mere existence of a scintilla of evidence' to support its position, but must instead proffer 'evidence on which the jury could reasonably find for the [plaintiff].'" (quoting *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004)).

Moreover, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("trial courts should not treat discrimination differently from other ultimate questions of fact." (internal quotation marks omitted)). Nonetheless, summary judgment should be "sparingly used where intent and state of mind are at issue, *see Montana v. First Fed. Sav. & Loan*

*Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir. 1989), because . . . careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (internal citations omitted); *see also Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) ("summary judgment is appropriate only when application of the law to th[e] . . . facts will reasonably support only one ultimate conclusion."); *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998).

## II.    Title VII - Hostile Working Environment

Plaintiff first alleges that she was subjected to a hostile working environment in violation of Title VII which, in pertinent part, provides: "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a). "To defeat a motion for summary judgment on a claim of racially hostile working environment, 'a plaintiff must produce evidence that the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Patterson*, 375 F.3d at 227 (alterations in original). "The matter of whether the conduct alleged was so 'severe or pervasive' as to create 'an objectively hostile or abusive work environment[]' is to be decided based on the totality of the circumstances, in light of such factors as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance . . . ." *Id.* (internal citations omitted) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 23 (1993)); *see also Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001).

29

Such factors "'must be considered cumulatively, so that we may obtain a realistic view of the work environment.'"  *Raniola*, 243 F.3d at 617 (quoting *Richardson*, 180 F.3d at 437).  The crux is "whether a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse."  *See Richardson*, 180 F.3d at 437.[30]

Here, the record is devoid of admissible evidence from which a rational factfinder could find that plaintiff was intimidated, ridiculed or insulted because of her race.  Of the approximately two hundred specific incidents of alleged harassment, only one has any racial overtones whatsoever.  In particular, plaintiff alleges that Henderson informed her that in April 2002,

> in an attempt to turn the entire teaching staff against [plaintiff,] Mrs. Gordon and Mrs. Phillips called a meeting and informed the teachers that [plaintiff] went to the NAACP on them.  This is another fabrication by members of the "clique" to place [plaintiff] in a bad light. . . . Plaintiff became aware of this through a surprise two hour interrogation by Olivia Henderson.

(*See* Complt. ¶¶ 83-84).  We first note that Henderson's statement is hearsay, and can thus only be considered as evidence of the fact that Henderson stated this to plaintiff.  *See Patterson*, 375 F.3d at 222; *Amnesty Am.*, 361 F.3d at 131 n.12; *Feingold*, 366 F.3d at 156 n.17.  In any event, it is clearly insufficient, standing alone, to sustain a hostile working environment claim.  *See Richardson*, 180 F.3d at 440 (dismissing a claim for hostile working environment when three of fifteen alleged

---

[30] A Title VII claim requires two additional elements.  First, "the victim [must] 'subjectively perceive[] the environment to be abusive.'"  *Richardson*, 180 F.3d at 436 (quoting *Harris*, 510 U.S. at 17) (alterations in original removed).  In the present case, it is clear that plaintiff meets this requirement, and we will therefore only address whether her working environment was "objectively" hostile.  The second requirement is that there must be "some reason to impute the discriminatory conduct of the employees that created the hostile working environment to the employer."  *Hill*, 2006 WL 3298383, at *14 (citing *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  Thus, the first step is to determine whether the record contains evidence showing that plaintiff was in fact subjected to discriminatory conduct.

30

incidents of harassment were racially charged, all three of which constituted disparaging, racist remarks, including that "all of the Black inmates looked alike"); *Hill*, 2006 WL 3298383, at *14 (dismissing the plaintiff's claim for hostile working environment when the plaintiff experienced various alleged incidents of harassment that were race neutral and was once called a "nigger" and a "retard" by her supervisors); *Bush*, 452 F. Supp. 2d at 413-14 (dismissing the plaintiff's claim for hostile working environment when the plaintiff alleged various incidents of harassment that were race neutral, including the fact that a co-worker intentionally slammed the plaintiff's fingers in a door); *Turner v. Baylor Richardson Med. Ctr.*, No. 05-11273, 2007 WL 122003, at *7 (5th Cir. Jan. 19, 2007) (dismissing the plaintiff's Title VII claim when the plaintiff's supervisor referred to inner city children as "ghetto children," stated to the plaintiff that she worked at a university where African Americans attended evening classes "because they could not qualify for regular admission" and "exhibited surprise or disdain when she learned that [the plaintiff] shopped at an upscale shopping mall, drove a Volvo, and had a son that bought and sold cars as a hobby.").

Plaintiff also alleges in her Verified Complaint that Runberg indicated to her at the onset of her employment that "some people . . . will not accept [her] because of the color of [her] skin." (*See* Complt. ¶ 11.) However, this statement is not substantiated anywhere in the record, even though both plaintiff and Runberg were deposed. *See Budde v. H & K Distrib. Co.*, 216 F.3d 1071, 1071 (2d Cir. 2000) ("Mere . . . unsubstantiated allegations by the opposing party are insufficient to defeat a motion for summary judgment.").[31] In any event, the fact that plaintiff's supervisor, prior to any

---

[31] In fact, a close review of the record sheds doubt on the veracity of plaintiff's allegation. Specifically, in plaintiff's performance evaluation of July 2001 to June 30, 2002, Runberg wrote that plaintiff's "refusal to meet and discuss the ongoing problems that has [sic] arisen between herself and certain faculty members has created an atmosphere of division in the building." (*See* Diaconis Decl., Ex. K.) In her rebuttal, plaintiff stated:

complaints of racial discrimination on behalf of plaintiff, warned her that some teachers may treat her differently as a result of her race is not relevant to whether plaintiff *in fact* experienced racial discrimination.  Similarly, plaintiff's unsubstantiated claim that Henderson stated that she too faced racism upon becoming an administrator, lends no support to plaintiff's claim that she herself was discriminated against.[32]

Assuming the veracity of plaintiff's allegations in her Verified Complaint, it is abundantly clear that plaintiff has faced numerous obstacles and difficulties at work.  A hostile working environment is certainly painful to endure, and this Court is sympathetic to plaintiff's plight.  Nevertheless, "[t]he Supreme Court has stated clearly that the antidiscrimination laws are not to be viewed as a 'general civility code.'" *Bush*, 452 F. Supp. 2d at 413 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).  Thus, Title VII requires that plaintiff show evidence that she was

---

How dare you try and blame the school climate on one person.  There was division in the school when I walked in as a Program Specialist during my first year in the district.  It was out of your mouth that you warned me of division in the school.  Additionally, you warned me that there were certain teachers in the school who would resist reporting to me.

(*See id.*)  It is indeed highly suspect that plaintiff would fail to mention in her rebuttal that Runberg actually warned her that "there were certain teachers in the school who would resist reporting to" her because she was African American, particularly since by this time she believed that she was being subjected to racial discrimination.  Nevertheless, we may not make credibility determinations at this stage, and will treat the statement for what it is: an unsubstantiated, although verified, allegation, which is insufficient to create a genuine issue of material fact on a motion for summary judgment.  *See Budde*, 216 F.3d at 1071.

[32] Plaintiff also emphasizes that Johns's failure to transfer her to North Junior High School "subject[ed] her to further hostile conduct." (*See* Pl. Mem. Opp. Summ. J. at 17.)  However, plaintiff offers no evidence that she was not transferred as a result of her race and, moreover, defendants have offered ample evidence of a legitimate, nondiscriminatory justification for the decision not to transfer plaintiff. *See supra* pp. 13-14.

discriminated against because of her race, and this she has not done.[33]  *See Richardson*, 180 F.3d at

440; *Hill*, 2006 WL 3298383, at *13; *Bush*, 452 F. Supp. 2d at 413 ("[T]he Second Circuit has

unambiguously stated that only conduct prompted by plaintiff's race or national origin contributes

to a hostile working environment claim.").  Although there is no evidence of racial bias or animus,

there is substantial evidence suggesting that plaintiff's problems stemmed from abrasive relations

with several of her coworkers.[34]  *See, e.g.*, *Neratko v. Frank*, 31 F. Supp. 2d 270, 284 (W.D.N.Y.

---

[33] Plaintiff's own characterization of her case is telling: "the heart of plaintiff's case [is] that she was subjected to repeated instances of insolent, unprofessional conduct by her subordinates and that the school district, as represented by the principal and numerous central office administrators, did not support her."  (*See* Pl. Mem. Opp. Summ. J. at 6.)  This is not the sort of conduct that is prohibited by Title VII.  *See Faragher*, 524 U.S. at 778 ("The[] standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'") (internal quotation marks omitted).

[34] At least two teachers, aside from Apuzzo, Gordon and Phillips, complained to Runberg about plaintiff, including Beverly Woods, an African American teacher, and "Mrs. Griffin."  (*See* Diaconis Decl., Ex. D (Runberg Dep. at 103-04).)  As noted, on one occasion, plaintiff withheld teacher awards from teachers who failed to attend a recognition ceremony, while presenting an award to a substitute teacher at the same ceremony.  *See supra* pp. 16-17.  Whether plaintiff's actions in this regard were fair or spiteful is certainly not for this Court to address, but it is clear that this would cause tension and conflict between plaintiff and certain teachers.  Furthermore, although plaintiff repeatedly alleges that Runberg was ineffectual in dealing with her complaints regarding the manner in which certain teachers treated her, plaintiff also complained to Henderson concerning "how he allowed teachers to speak to *him* . . . ."  (*See* Diaconis Decl., Ex. F (Henderson Dep. at 42) (emphasis added).)  It is clear that plaintiff and Runberg had different approaches in handling certain teachers, and, in fact,  Mucci, President of the Administrators Union, informed plaintiff that Runberg expressed concern that she was not "a good match for him as an administrative partner."  (*See* Diaconis Suppl. Decl., Ex. X (Pl. Dep. at 126); Complt. ¶ 156.)  The record also contains numerous examples of plaintiff's abrasiveness towards her coworkers, including her supervisors. For example, plaintiff wrote a highly aggressive rebuttal to Runberg's generally favorable evaluation of her in February 2002.  (*See* Diaconis Decl., Ex. G.)  In addition, Henderson testified that during attempts to resolve issues between plaintiff and teachers, plaintiff repeatedly stated "when [I'm] right, [I'm] right, and [I] do[] not back down."  (*See* Diaconis Decl., Ex. F (Henderson Dep. at 43).)  Similarly, Johns testified:

> On one occasion we had I think a very significant conversation about the role of an administrator and I remember saying to her that the administrator solves problems,

1998) ("Personal animosity is not the equivalent of . . . discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a discrimination case by accusation."). Accordingly, plaintiff's hostile working environment claim under Title VII must be dismissed.[35]

### III.    Title VII - Disparate Treatment/Intentional Discrimination

Plaintiff next alleges that she was discharged from her position on the basis of her race in violation of Title VII. In evaluating defendants' motion for summary judgment, we must apply the burden-shifting analysis first set forth by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Under this framework, in order to establish a claim for intentional discrimination under Title VII, a plaintiff must first establish a *prima facie* case of racial discrimination. *See Hicks*, 509 U.S. at 506; *Patterson*, 375 F.3d at 221. A *prima facie* case requires that a plaintiff show that: (1)

---

they don't make problems, and she was very defensive about the actions that she had taken about the – in the building, and I tried to convince her that the issues were trivial and which got blown way out of proportion and she was contributing to that escalation. . . . She insisted that she was on the high ground and that she was right, and that she would stand her ground.

*See* Diaconis Decl., Ex. S (Johns Dep. at 28).) Dupree also testified that he remembered that "personality conflict [w]as . . . part of the problem[,] . . . and after a while [he] began to feel that [plaintiff] wasn't putting out the effort that [he] would [have] like[d] her to put out in order to resolve this conflict with the teachers." (*See* Diaconis Suppl. Decl., Ex. Y (Dupree Dep. at 15, 67-68).) In the face of such evidence, and in the almost total absence of any evidence of racial animus or bias, we do not believe that a reasonable jury could find that her alleged mistreatment was racially motivated.

[35] To the extent that plaintiff has brought claims under § 1981a, the Fourteenth Amendment and the New York Human Rights Law for hostile working environment, they are dismissed for the same reasons that plaintiff's Title VII claim is dismissed. *See Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143-44 (2d Cir. 1993) (recognizing a claim for hostile working environment under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution).

she is a member of a protected class; (2) she satisfactorily performed her job; (3) she suffered an adverse employment action; and (4) the adverse employment action "occurred under circumstances giving rise to an inference of discrimination on the basis of [the] plaintiff's membership in that class." *See Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001); *Graham* , 230 F.3d at 38; *Hill*, 2006 WL 3298383, at *6.[36]

Once the plaintiff presents a *prima facie* case of intentional discrimination, the defendant has the burden of producing evidence that the adverse employment actions were taken for legitimate, nondiscriminatory reasons. *See Hicks*, 509 U.S. at 506-07; *Patterson*, 375 F.3d at 222; *Hill*, 2006 WL 3298383, at *6. Specifically, the defendant "'must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55, 255 n.8 (1981)) (emphasis in original); *see also Farias*, 259 F.3d at 98 ("The defendant is not required to prove that the articulated reason actually motivated its actions."). "'If the defendant carries this burden of

---

[36] Interestingly, plaintiff's counsel failed to make any argument that plaintiff has established a *prima facie* case for racial discrimination, reasoning that defendants conceded that plaintiff met this initial burden. (*See* Pl. Mem. Opp. Summ. J. at 12.) To the contrary, defendants clearly contend that plaintiff has not met her *prima facie* case. (*See* Defs. Mem. Supp. Summ. J. at 9-10; Defs. Suppl. Mem. Supp. Summ. J. at 8.) Nevertheless, we have undertaken a thorough examination of the record and have addressed all reasonable arguments related to plaintiff's *prima facie* case.

Notably, defendants do not contest that: (1) plaintiff is a member of a protected class; (2) she satisfactorily performed her job; and (3) her termination constitutes an adverse employment action. Although plaintiff's submissions are unclear, plaintiff seems to claim that Johns's failure to transfer her to North Junior High School also constitutes an adverse employment action. (*See* Pl. Mem. Opp. Summ. J. at 11.) The law is clear, however, that "the denial of a transfer to an equal or lesser position in a different locale does not constitute an adverse employment action." *See, e.g.*, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 124 (2d Cir. 2004).

production, the presumption raised by the prima facie case is rebutted[,]'" *Hicks*, 509 U.S. at 507

(quoting *Burdine*, 450 U.S. at 255); *Patterson*, 375 F.3d at 222, "and the defendant 'will be entitled

to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding

of prohibited discrimination . . . .'"   *Farias*, 259 F.3d at 98; *see also Hicks*, 509 U.S. at 507-08;

*Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006); *Patterson*, 375 F.3d at 222 (citing *Smith v. Am.*

*Express Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988)); *Graham*, 230 F.3d at 38 ("If such a reason is

proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for

the employment action."); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 561 (S.D.N.Y.

2005) (citing *Hicks*, 509 U.S. at 511).

      In the present case, plaintiff has failed to establish a *prima facie* case of racial discrimination

because the record contains no evidence that gives rise to an inference that either her treatment by

fellow employees or the decision to terminate her employment was based on her race.  Usually, a

party establishes an inference of racial discrimination by "demonstrating that other similarly situated

persons, not of [plaintiff's] protected class . . . , were treated more favorably than her in the

workplace."  *Hill*, 2006 WL 3298383, at *11.  Here, plaintiff has failed to make such a showing.

Although plaintiff repeatedly avers in her Verified Complaint, in particular, after each alleged

incident of harassment, that "[u]pon information and belief the [p]laintiff knows of no other white

assistant principal, past or present, who has experienced similar treatment in the [District]," (*see*

*generally* Complt.), this generalized allegation is clearly insufficient to sustain her burden.  *See*

*Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 47 (2d Cir. 2005); *Patterson*, 375 F.3d at 219 ("[A]

genuine issue [is not] created merely by the presentation of assertions that are conclusory."); *Farias*,

259 F.3d at 99 (declining to accept conclusory statements unsupported by the record as grounds to

deny summary judgment); *Hill*, 2006 WL 3298383, at *6 ("Evidence of disparate treatment cannot be based on conclusory allegations.").

The only specific evidence proffered by plaintiff to show disparate treatment is utterly without probative value.  In particular, plaintiff claims that subsequent to this lawsuit, the District failed to terminate Copeletti and Fairey for violating FERPA.  However, plaintiff's circumstances are dissimilar to those of Copeletti and Fairey in almost every respect.  *See Graham*, 230 F.3d at 39 ("When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, . . . the plaintiff must show [that] she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)).

As a preliminary matter, we note that any employment action (or lack thereof) to which Fairey was subjected is irrelevant to this analysis because he is African American.  *See Graham*, 230 F.3d 39 (stating that the purported similarly situated individual must be outside the plaintiff's protected group); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (same).[37] Additionally, Copeletti and Fairey were tenured administrators, while plaintiff was a probationary employee.  *See, e.g.*, *Feingold*, 366 F.3d at 153 ("It is true that, as a probationary [employee], [plaintiff] was not similarly situated to the other [tenured employees] with respect to the conditions under which he could be terminated, and thus the mere fact that he was fired for his adjudications, while they were not, would not by itself support an inference of discrimination.").  Finally, the underlying facts constituting the respective violations of FERPA are not at all similar.  The District

---

[37] If anything, however, the fact that the District subjected Fairey, an African American employee, to the same treatment as Copeletti, a Caucasian employee, evinces a lack of disparate treatment.

did not terminate plaintiff merely because she violated FERPA, but because she exercised "poor judgment in the use of School District resources when [she] directed clerical staff members . . . to spend several hours each over a two day period copying student records and teacher personnel records without any prior administrative approval and for no apparent school related purpose." (*See* Diaconis Decl., Ex. N.)  In contrast, Copeletti and Fairey merely mailed post cards to parents notifying them of their children's grades in violation of FERPA.  The only similarity between the two incidents is that they both concern student privacy rights.  *See Graham*, 230 F.3d at 40 (stating that similarly situated individuals must have engaged in "comparable conduct").  But the actions of Copeletti and Fairey were not patently unreasonable because "the school had a practice in existence for several years of mailing grades out in this manner which practices pre-dated . . . Copeletti's and . . . Fairey's involvement in the matter." (*See* Saturnelli Aff. ¶¶ 3-4.)[38]  Thus, plaintiff and Copeletti are not similarly situated, and the District's handling of the situation involving Copeletti and Fairey does not evidence disparate treatment.

In the absence of evidence of disparate treatment, plaintiff must submit some evidence that creates a genuine issue as to whether plaintiff's termination was motivated by racial bias or animus. Here, the record is devoid of any such evidence.  *See Patterson*, 375 F.3d at 212-13, 221-24 (concluding that the plaintiff did not present evidence giving rise to an inference of racial discrimination when the plaintiff showed a past pattern of racially hostile conduct by co-workers but failed to provide any evidence of bias on the part of the individuals who made the decision to terminate the plaintiff); *Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002)

---

[38] Additionally, Copeletti and Fairey had different supervisors than plaintiff, which has been recognized as a factor militating against finding individuals similarly situated.  *See Graham*, 230 F.3d at 39; *Shumway*, 118 F.3d at 64.

(dismissing the plaintiff's Title VII claim for racial discrimination because the plaintiff failed to submit evidence of racial animus on the part of those involved in his termination); *Duclair v. Runyon*, 166 F.3d 1200, 1200 (2d Cir. 1998) (concluding that the plaintiff failed to establish a *prima facie* case of discrimination when the evidence showed that the plaintiff's supervisor disliked him personally but never made a derogatory racial or ethnic remark). Plaintiff merely describes her "alleged mistreatment and ask[s] the court to conclude that it must have been related to [her] race. This is not sufficient." *Grillo*, 291 F.3d at 235 (internal quotation marks omitted; alterations added). Accordingly, plaintiff has failed to establish a *prima facie* case of racial discrimination and her claims for racial discrimination must be dismissed.

Even assuming, *arguendo*, that plaintiff has established a *prima facie* case of racial discrimination, defendants have submitted admissible evidence that plaintiff was terminated for a legitimate, nondiscriminatory reason. Plaintiff, for her part, has failed to submit any evidence that reasonably supports the finding that the District's purported justification was a pretext for racial discrimination. In particular, defendants have shown that the District terminated plaintiff because she exercised poor judgment in directing two school clerical staff members to make, over the course of two business days, voluminous copies of student records, teachers' evaluations and memoranda which she subsequently brought home with her without any prior administrative approval or school-related purpose. *See supra* pp. 24-25. In response, plaintiff contends that: (1) she was following Johns's instructions to copy her work product in anticipation of their meeting regarding her performance evaluations; (2) neither the District nor Johns contacted her in connection with the District's investigation of this matter prior to their decision to terminate her which, according to plaintiff, is evidence of bad faith; and (3) the District had allowed her and other administrators to

39

make copies of student records on previous occasions. *See supra* pp. 25-26. However, absent any indicia of racial discrimination on the part of defendants, this is insufficient to defeat defendants' motion for summary judgment. *See Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 561 (S.D.N.Y. 2005) ("There can be absolutely no doubt that . . . plaintiff bears the burden of proving not just pretext, but racial discrimination, *St. Mary's Honor Center*, 509 U.S. at 511, 113 S.Ct. 2742, and thus the burden of pointing the court to . . . evidence that would raise a disputed issue of material fact on this score."); *see also Joseph*, 465 F.3d at 93 (dismissing Title VII claim for racial discrimination when the employer proffered a nondiscriminatory justification for the plaintiff's termination and the plaintiff pointed to no evidence for a reasonable jury to conclude that the plaintiff was discriminated against on the basis of his race). Accordingly, even assuming, *arguendo*, that plaintiff has established a *prima facie* case of racial discrimination, plaintiff's claim still must fail, as she has proffered no evidence that her termination was racially motivated.[39]

## IV.    Title VII - Retaliation

Plaintiff also alleges that defendants discharged her in retaliation for her complaints of racial discrimination in violation of Title VII which, in pertinent part, "forbids an employer to retaliate against an employee for, *inter alia*, complaining of employment discrimination prohibited by Title VII . . . ." *Kessler*, 461 F.3d at 205; *see also* 42 U.S.C. § 2000e-3(a). Similar to claims for racial discrimination, claims of retaliation pursuant to Title VII "are analyzed according to the burden-

---

[39] To the extent plaintiff has brought claims for racial discrimination pursuant to § 1981a, the Fourteenth Amendment and the New York Human Rights Law, they are dismissed for the same reasons that plaintiff's Title VII claim is dismissed. *See Hill*, 2006 WL 3298383, at *20; *see also supra* n.1.

shifting framework set forth in *McDonnell Douglas Corp. . . . .*"  *Wimes v. Health*, 157 F. App'x

327, 327 (2d Cir. 2005); *Reed*, 95 F.3d at 1178; *Bush*, 452 F. Supp. 2d at 415.   In order to present

a *prima facie* case of retaliation under Title VII,

> a plaintiff must adduce "evidence sufficient to permit a rational trier of fact to find
> (1) that [] he engaged in protected participation or opposition under Title VII . . ., (2)
> that the employer was aware of this activity, (3) that the employer took adverse action
> against the plaintiff, and (4) that a causal connection exists between the protected
> activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the
> adverse employment action."

*Kessler*, 461 F.3d at 205 (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (internal

brackets in original); *see also Wimes*, 157 F. App'x at 327-28; *Reed*, 95 F.3d at 1178; *Quinn v.

Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998); *Hill*, 2006 WL 3298383, at *15.

    "As to the 'protected activity' element of a Title VII . . . retaliation claim, the plaintiff need

only 'have a good faith, reasonable belief that he was opposing an employment practice made

unlawful by Title VII . . . .'" *Kessler*, 461 F.3d at 210 (quoting *McMenemy v. City of Rochester*, 241

F.3d 279, 285 (2d Cir. 2001); *Wimes*, 157 F. App'x at 328; *Wimmer v. Suffolk County Police Dep't*,

176 F.3d 125, 135 (2d Cir.), *cert. denied*, 528 U.S. 964 (1999) ("a plaintiff may state a prima facie

case for retaliation even when her primary claim for discrimination is insufficient to survive

summary judgment."); *Reed*, 95 F.3d at 1178 (quoting *Manoharan v. Columbia Univ. Coll. of

Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) ("A plaintiff "'need not establish that the

conduct [s]he opposed was in fact a violation of Title VII . . . .'"") (internal alterations in original);

*Quinn*, 159 F.3d at 769.   Nonetheless, plaintiff still fails to satisfy this element because the record

is devoid of any evidence showing racial animus or bias.   Rather, the record shows, at most, that

plaintiff was shamefully mistreated by a group of teachers who were Caucasian and that her

supervisor ineffectually handled the situation.  This is clearly insufficient.

Perhaps the fact that plaintiff was:  (1) mistreated by a group of Caucasian teachers; (2) informed by Runberg at the onset of her employment that she may be treated differently because of her race; (3) informed by Henderson that she also faced racism upon becoming an administrator; and (4) not transferred to North Junior High School upon her request, would, taken together, militate in favor of a finding that plaintiff reasonably and in good faith believed that certain teachers were racially discriminating against her.  However, plaintiff's allegations that (i) Runberg indicated to her that she may be treated differently as a result of her race and that (ii) Henderson stated that she also faced racism upon becoming an administrator, are not substantiated (and, in the case of Henderson, controverted) by the record.  No evidence exists even in the submitted portion of plaintiff's own deposition to support these allegations.  While plaintiff's pleading is verified, "[m]ere . . . unsubstantiated allegations by the opposing party are insufficient to defeat a motion for summary judgment."  *See Butler*, 150 F. App'x at 47 (holding that the plaintiff did not sufficiently show that he reasonably believed that he was subjected to racial discrimination because his claim that other white employees being disciplined less severely than blacks "was not supported by other record evidence or by specific examples in [the plaintiff's] own testimony."); *Budde*, 216 F.3d at 1071; *Bush*, 452 F. Supp. 2d at 416-17.  Thus, left with only the substantiated allegations that plaintiff was mistreated by her Caucasian coworkers and denied a request to transfer to another school, plaintiff cannot show that she had a reasonable basis to believe that she was subjected to racial discrimination.

Assuming, however, that plaintiff reasonably and in good faith believed that she was subjected to racial discrimination, plaintiff cannot make a sufficient showing of a causal connection

between her complaints of racial discrimination and her termination.  A plaintiff can show a sufficient causal connection between the protected activity and the adverse employment action "either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant.'" *Raniola*, 243 F.3d at 626 (quoting *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *Butler*, 150 F. App'x at 47.  As with her discrimination claims, plaintiff provides no direct evidence of a retaliatory motive for her termination aside from her own conclusory allegations, which are plainly insufficient to defeat defendants' motion for summary judgment.  *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) ("[A] plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link.  Instead, he must produce 'some tangible proof to demonstrate that [his] version of what occurred was not imaginary.'" (internal citations omitted; alterations in original)); *Budde*, 216 F.3d at 1071; *Bush*, 452 F. Supp. 2d at 416-17.

In the absence of such evidence, plaintiff must rely on the temporal proximity of the protected action and the adverse employment action.  *See Butler*, 150 F. App'x at 47 ("Where there is no direct evidence of a causal relationship, a plaintiff may show a causal relationship by showing temporal proximity.")  The Supreme Court has recently noted that

> [t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neil v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 ([10th Cir.] 2001).  *See, e.g.*, *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 ([10th Cir.] 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-[75] ([7th Cir.] 1992) (4-month period insufficient).

43

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). Nonetheless, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ." *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (finding that a lapse of four months is insufficient to defeat the plaintiff's claim for retaliation). One district court stated, however, that "[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation[,]" *see Yarde*, 360 F. Supp. 2d at 562, while another court stated that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." *See Cunningham v. Consol. Edison Inc.*, No. CV-03-3522, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (three months too remote); *see also Kessler*, 461 F.3d at 210-11 (concluding that a causal connection was established when the plaintiff: (1) was reprimanded two months after the plaintiff first filed a discrimination complaint; (2) was demoted one day after he requested information to support his complaint; and (3) was transferred one week after he made a follow-up request for such information); *Butler*, 150 F. App'x at 47 (one year too remote); *Feingold*, 366 F.3d at 157 (two weeks not too remote); *Cifra*, 252 F.3d at 216 (twenty days not too remote); *Raniola*, 243 F.3d at 626 (seven days not too remote); *Reed*, 95 F.3d at 1178 (twelve days not too remote); *Quinn*, 159 F.3d at 769 (not too remote when the adverse employment action took place two months after the plaintiff filed a complaint with the defendant and ten days after she filed a complaint with the New York Division of Human Rights); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (three months too remote); *Hill*, 2006 WL 3298383, at *17 n.30 (one month not too remote); *James v. Newsweek*, No. 96 Civ. 0393, 1999 WL 796173, at *15 (S.D.N.Y. Sept. 30, 1999) (four months too remote); *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th

Cir. 1997) ("the four month time lag between [the plaintiff's] participation in protected activity and his termination by itself would not be sufficient to justify an inference of causation") (cited in *Morris v. Lindau*, 196 F.3d 102, 113 (2d Cir.1999)).

In the present case, construing the record in the light most favorable to plaintiff, plaintiff complained to Johns of racial discrimination on July 18, 2003, and Johns first notified plaintiff of her termination on December 18, 2003.[40]  Thus, there was a five-month interval between her complaint of racial discrimination and her termination.  As is evident from the case law in this circuit, in the absence of other evidence of retaliatory motive, such a time lapse precludes a finding of causal connection between the protected activity and the adverse employment action based on temporal proximity.  Also, any connection between the adverse employment action and her complaints of racial discrimination are further attenuated because the misconduct for which plaintiff was terminated occurred after her complaints, and defendants have not cited as justification for her termination a reason that preexisted her complaints.  Furthermore, as early as the spring of 2002, Woods complained to Johns that plaintiff was subjected to racial discrimination, *see supra* pp. 14-15, approximately a year-and-a-half prior to plaintiff's termination, and the District has never taken any adverse employment action against Woods, who is still employed by the District.  Accordingly, plaintiff is unable to show a causal connection between her protected conduct and the adverse

---

[40] It is not clear when, if ever, plaintiff first complained of racial discrimination.  However, plaintiff alleges in her Amended Complaint that in the summer of 2003, she complained to Johns that Runberg "was adversely rating her as an administrator as a consequence of his racial bias."  (*See* Am. Complt. ¶ 7.)  The record makes clear that this refers to her telephone conversation with Johns on July 18, 2003 immediately after she received her performance evaluations from Runberg.

employment action, and plaintiff's Title VII claim for retaliation must be dismissed.[41]


V.      **First Amendment Retaliation**

        Plaintiff also has included a count for retaliatory discharge under the First Amendment to the

United States Constitution.  To state a claim under § 1983 for retaliation in violation of the First

Amendment, plaintiff must demonstrate that: (1) her speech was constitutionally protected; (2) she

suffered an adverse employment action; and (3) a causal connection exists between the protected

speech and the adverse employment action. *See Feingold*, 366 F.3d at 160; *Washington v. County

of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004); *McGuire v. Warren*, 404 F. Supp. 2d 530, 536

(S.D.N.Y. 2005) (Conner, J.).  Here, plaintiff's speech, *i.e.*, her complaints that she was subject to

racial discrimination, are not constitutionally protected.  Although "persons do not relinquish their

first amendment protections to comment on matters of public interest by becoming public

employees[,]" *Piesco v. City of New York, Dep't of Personnel*, 933 F.2d 1149, 1155 (2d Cir. 1991),

"when playing the role of employer, the state possesses 'greater leeway to control employees' speech

that threatens to undermine its ability to perform its legitimate functions.'" *Lewis v. Cowen*, 165 F.3d

---

[41] Even assuming *arguendo* that plaintiff has established a *prima face* case of Title VII
retaliation, defendants have offered a non-retaliatory, legitimate reason for plaintiff's termination,
and plaintiff has not submitted any evidence showing that defendants' purported reason is a pretext
for retaliation.  *See supra* pp. 39-40.  *See Kemp v. A & J Produce Corp.*, 164 F. App'x 12, 16 (2d
Cir. 2005); *Feingold*, 366 F.3d at 157; *Hill*, 2006 WL 3298383, at *18.  In addition, to the extent that
plaintiff has brought a claim for retaliation pursuant to § 1981a and the New York Human Rights
Law, they are dismissed for the same reasons that plaintiff's Title VII claim is dismissed.  *See
Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) ("[R]etaliation claims under
the NYSHRL are generally governed by the same standards as federal claims under Title VII.  For
the same reasons that [the plaintiff] has failed to present a triable issue of fact for her federal
retaliation claim, her state retaliation claim also fails." (internal citations omitted)); *Moore v. Consol.
Edison Co. of N.Y., Inc.*, 409 F.3d 506, 508 n.2 (2d Cir. 2005) (recognizing a retaliation claim
pursuant to § 1981a); *see also supra* n.1.

154, 161 (2d Cir. 1999).  Accordingly, for a public employee's speech to be protected under the First Amendment, it must first relate to a "matter of political, social or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).

The determination of whether a particular instance of speech relates to a matter of public concern is a question of law for the court and must be "determined by the content, form, and context of a given statement, as revealed by the whole record."  *Id.* at 148; *see Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005) (Conner, J.).  In making its determination, the court should focus on the motive of the speaker and attempt to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.  *See Lewis*, 165 F.3d at 163-64; *Hanig*, 384 F. Supp. 2d at 722.  The key inquiry is whether the statements were made by plaintiff in her role as a disgruntled employee or her role as a concerned citizen.  *See Lewis*, 165 F.3d at 163-64; *Hanig*, 384 F. Supp. 2d at 722.

In the present case, it is abundantly clear that plaintiff's complaints regarded her individual employment and the manner in which she was treated at the workplace.  Plaintiff complained to Johns *in private* regarding the performance evaluations that she received from Runberg and the racial discrimination to which she was subjected.  Plaintiff's speech was not designed to reveal District-wide racism, or address the impact of racism on the school environment, but rather, she was attempting to alleviate her own personal situation in the workplace.  *See Brown-Scott v. Hartford Bd. of Educ.*, 51 F. App'x 70, 71 (2d Cir. 2002) (dismissing the plaintiff's First Amendment retaliation claim when the plaintiff complained of racial and age discrimination, reasoning that the plaintiff's complaint "focused entirely on her personal situation and had not been filed to implicate any system-wide problem with the [school d]istrict"); *Grillo*, 291 F.3d at 235-36 (dismissing the

47

plaintiff's First Amendment retaliation claim because there was "no evidence that the[] statements were uttered for any other reason than to protect [the plaintiff's] owns rights or to air his personal grievances."). Accordingly, plaintiff's speech is not protected for purposes of her First Amendment retaliation claim,[42] and that claim must therefore be dismissed.[43]

Whether plaintiff was treated unfairly by her colleagues or whether she was the "escalator" as alleged by defendants (or, more likely, a combination thereof) is not for us to decide. Rather, we must determine whether there are any genuine issues of material fact and whether a reasonable jury could find that plaintiff was subjected to racially discriminatory treatment or retaliation for protected conduct. After carefully considering the entire record, it is clear that plaintiff has submitted no admissible evidence showing that her coworkers were motivated by racial bias or animus or that

---

[42] While the Second Circuit has recognized that the First Amendment provides for a claim of retaliatory discharge as the result of the actions of a plaintiff's spouse, *see Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999), plaintiff's husband's speech is similarly not of a public concern because it related to plaintiff's individual situation. More specifically, Woods complained at least three times to Johns regarding the alleged racial discrimination to which plaintiff was subjected. First, in June 2002, at a committee meeting convened to discuss the recruitment of minorities, Woods stated that plaintiff was repeatedly subjected to racial discrimination. Shortly thereafter, at a private meeting with Johns, Woods reiterated his concerns, and, lastly, Woods complained to Johns on July 18, 2003 regarding plaintiff's performance evaluation soon after plaintiff spoke to Johns on the telephone regarding the same. Clearly, all of these statements relate solely to plaintiff's personal situation and are therefore not protected by the First Amendment. Even assuming, *arguendo*, that Woods's statements constitute protected speech for the purpose of plaintiff's First Amendment retaliation claim, plaintiff cannot establish a causal connection between his speech and her termination. Specifically, Woods first complained of racial discrimination on his wife's behalf as early as June 2002, a year-and-a-half prior to plaintiff's termination, and last complained on July 18, 2003, five months prior to plaintiff's termination. In the absence of other evidence showing a retaliatory motive, this is not sufficient to establish a causal connection between his speech and plaintiff's termination. *See supra* pp. 45-46.

[43] Even assuming, *arguendo*, that her speech was protected, the claim would still fail because, as explained *supra* pp. 43-46, 48 n.42, she has failed to submit any admissible evidence of a causal connection between her and Woods's speech and the adverse employment action.

defendants terminated plaintiff for discriminatory or retaliatory reasons.  Rather, plaintiff submits a litany of alleged incidents of harassment, which occurred over a period of more than three years, that are almost all entirely race-neutral.  The record strongly suggests that plaintiff's alleged problems at Gardnertown were unrelated to her race and more likely attributable to personality conflicts with four of her coworkers, all of whom are Caucasian.  The only allegations that relate at all to race are either unsubstantiated by admissible evidence or insufficient as a matter of law to create a genuine issue of material fact as to whether plaintiff was subjected to racial or retaliatory treatment.  Under these circumstances, defendants' motion for summary judgment must be granted.

## CONCLUSION

For the reasons stated above, the motion for summary judgment filed by defendants Enlarged City School District of Newburgh and Dr. Richard Nicholas Johns is granted in its entirety and the Clerk's Office is directed to enter judgment.

SO ORDERED.

Dated: White Plains, NY
       February 7, 2007

_William C. Conner_
Senior United States District Judge

49